* * * * * * * * * * *
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms, with some modifications, the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. Plaintiff's Decedent worked at FMC Corp. f/k/a Lithium Corp. of America (hereinafter referred to as "Defendant-Employer"), at the same facility in Bessemer City, North Carolina, from May 28, 1969 through December 3, 1997. Lithium Corporation of America owned the Bessemer City facility from May 28, 1969 until sometime in 1985. In 1985, FMC-Lithium Corporation bought the assets of Lithium Corporation of America, pursuant to a bulk bill of sale. FMC-Lithium Corporation *Page 3 
changed its name, and eventually merged into FMC Corporation, in 1990. FMC Corporation owned the Bessemer City facility from 1990 through Plaintiff's Decedent's last day of employment there, on December 3, 1997.
2. Aetna/Travelers (hereinafter referred to as "Defendant-Carrier Aetna") provided workers' compensation insurance coverage to Defendant-Employer from November 1, 1969 through April 15, 1972. CNA (Fidelity Casualty, Pacific Insurance Co., Continental Insurance Co.) (hereinafter referred to as "Defendant-Carrier CNA") provided workers' compensation insurance coverage to Defendant-Employer from April 15, 1974 through April 14, 1980. Northwestern National (hereinafter referred to as "Defendant-Carrier Northwestern") provided workers' compensation insurance coverage to Defendant-Employer from April 15, 1980 through April 15, 1985. Crawford Co. (National Union Fire Insurance/AIG) (hereinafter referred to as "Defendant-Carrier Crawford-National") provided workers' compensation insurance coverage to Defendant-Employer from October 1, 1984 through October 1, 1992. Crawford Co. (Insurance Company — State of Pennsylvania/AIG) (hereinafter referred to as "Defendant-Carrier Crawford-Pennsylvania") provided workers' compensation insurance coverage to Defendant-Employer from October 1, 1992 through December 3, 1997.
3. Fidelity Casualty, Pacific Insurance Co., and Continental Insurance Co. are all CNA companies, or CNA is the successor-in-interest to these companies. National Union Fire Insurance and Insurance Company-State of Pennsylvania are both AIG companies, or AIG is the successor-in-interest to these companies. *Page 4 
4. The parties are subject to the North Carolina Workers' Compensation Act, and Defendant-Employer employed the requisite number of employees to be bound by the provisions of the North Carolina Workers' Compensation Act.
 * * * * * * * * * * * ISSUES
The issues for determination are:
1. Whether Plaintiff's Decedent's asbestosis is a compensable occupational disease for which Appealing Defendants are liable under the North Carolina Workers' Compensation Act?
2. Whether Plaintiff's Decedent's asbestosis contributed to the cause of death of Plaintiff's Decedent?
3. Whether Plaintiff's Decedent's colon cancer is a compensable occupational disease for which Appealing Defendants are liable under the North Carolina Workers' Compensation Act?
4. Whether and when Plaintiff's Decedent became last injuriously exposed to the hazards of asbestos, or to the hazards contributing to any of Plaintiff's Decedent's occupational diseases, during his employment with Defendant-Employer?
5. Whether Plaintiff or Plaintiff's Decedent's estate is entitled to any benefits under the North Carolina Workers' Compensation Act?
6. Whether Plaintiff was totally dependent upon Plaintiff's Decedent at the time of Plaintiff's Decedent's death, and if so, to what benefits is Plaintiff entitled as a result thereof?
7. Whether Plaintiff was disabled at the time of Plaintiff's Decedent's death?
8. Whether any workers' compensation benefits due to Plaintiff should be increased by 10 percent, pursuant to § 97-12 of the North Carolina General Statutes? *Page 5 
9. Whether Plaintiff is entitled to attorney's fees, pursuant to § 97-88.1 of the North Carolina General Statutes?
10. Whether the appealing defendants are liable for any benefits imposed as sanctions?
11. Whether Plaintiff is entitled to any benefits pursuant to § 97-61.5 of the North Carolina General Statutes?
12. Whether Plaintiff's Decedent became permanently and totally disabled due his occupational diseases, and for what period of time?
13. Whether Plaintiff is entitled to any benefits due to Plaintiff's Decedent's permanent and total disability?
14. Whether Plaintiff is entitled to any benefits for attendant care?
15. Whether Plaintiff's Decedent's colon cancer is causally related to any exposure to asbestos during Plaintiff's Decedent's employment with Defendant-Employer?
16. Whether the appealing defendants are entitled to any credits due to Plaintiff's recovery from third-party tort-feasors?
 * * * * * * * * * * *
Based upon the competent and the credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff's Decedent worked at the same chemical plant in Bessemer City, North Carolina from May 28, 1969 through December 3, 1997. Built in the mid-1950's, there were insulated steam pipes and insulated vessels throughout the chemical plant. Most of the insulation on the steam pipes, the vessels, the tanks, and the boilers contained asbestos. *Page 6 
2. Mr. William Howard Teague worked in the chemical plant with Plaintiff's Decedent from 1969 through the end of Plaintiff's Decedent's employment in 1997. Mr. Teague saw Plaintiff's Decedent on a daily basis, and saw him performing a variety of work, including performing carpentry; performing concrete work; replacing brick in the keel; cleaning up insulation and scrap metal in the boiler area; performing small repairs of insulation; cutting asbestos-containing transite wall; replacing the sides on all of the boilers; and working with asbestos-containing insulation, including cleaning asbestos-containing insulation with a shovel and with a broom. In performing each of these tasks, Plaintiff's Decedent was either working with asbestos-containing insulation, repairing and cleaning asbestos-containing insulation, or working in close proximity to others who were disturbing asbestos-containing products. Mr. Teague further testified that he, Plaintiff's Decedent, and all maintenance employees had dusty trades cards.
3. According to Mr. Teague, Plaintiff's Decedent's job duties of handling insulation, of maintaining the roof on the chemical plant, and the other duties which involved disturbing and dealing with asbestos-containing materials, continued throughout Plaintiff's Decedent's employment. Mr. Teague and other employees later became aware that they should not cut and/or grind transite, which was in many areas of the chemical plant, since it contained asbestos.
4. Mr. Teague saw Plaintiff's Decedent inside the chemical plant throughout Plaintiff's Decedent's employment. During the last 10 years of Plaintiff's Decedent's employment, he did mostly outdoor work, including emptying trash. However, Mr. Teague continued to see Plaintiff's Decedent pick up and clean up asbestos-containing insulation throughout the chemical plant on a daily basis.
5. Mr. Teague testified that most of the asbestos-containing insulation in the chemical plant became damaged and began to deteriorate all throughout the plant through the early 1990's. Several *Page 7 
stipulated exhibits, including records from environmental consultants indicating insulation around air ducts in the chemical plant was in poor condition, corroborated Mr. Teague's testimony concerning the deterioration of the asbestos-containing insulation in the chemical plant.
6. Mr. Dennis Brooks McAbee worked with Plaintiff's Decedent at the chemical plant from 1971 through 1979, and from 1980 through 1981. Mr. McAbee worked with Plaintiff's Decedent everyday while working for the building and grounds department. Mr. McAbee and Plaintiff's Decedent made repairs on asbestos-containing insulation, cleaned up after making repairs to asbestos-containing insulation, as well as worked around damaged asbestos-containing insulation when they were setting pumps, putting in forms, and performing circuit work. This asbestos-containing insulation that Mr. McAbee and Plaintiff's Decedent handled would occasionally be damaged to the point that it would hang off of pipes.
7. Mr. Michael Lloyd Loveday worked with Plaintiff's Decedent at the chemical plant from 1972 through 1996. Mr. Loveday worked alongside Plaintiff's Decedent throughout Plaintiff's Decedent's employment at the chemical plant, performing tasks such as replacing, climbing onto, and painting boilers which had asbestos-containing insulation. Mr. Loveday and Plaintiff's Decedent re-wrapped asbestos-containing insulation on at least a weekly basis throughout the mid-1980's.
8. Mr. Loveday and Plaintiff's Decedent also worked around asbestos-containing transite siding, performing tasks such as sawing and drilling holes in this transite siding from the 1970's through the mid-1980's. Mr. Loveday and Plaintiff's Decedent continued this work around asbestos-containing transite siding periodically throughout Plaintiff's Decedent's employment. Mr. Loveday described the asbestos-containing transite siding as brittle, cracking, and prone to creating dust. Mr. Loveday also *Page 8 
recalled that he and Plaintiff's Decedent would work regularly with asbestos-containing gaskets, which they would cut.
9. Mr. Loveday testified that Plaintiff's Decedent worked all over the plant, and that Plaintiff's Decedent came into contact with asbestos-containing materials found all over the plant on a daily basis. In the last 10 years of Plaintiff's Decedent's employment, there was asbestos-containing material in the boiler room, in the "hypo" area, in the research and development area, and around metal cells, all of which Plaintiff's Decedent would be in contact with on a daily basis.
10. Mr. Richard Krueger is a chemical engineer who obtained a bachelor of science degree in chemical engineering in 1956, and then spent several years designing industrial steam systems. As part of Mr. Krueger's job duties, he learned about different types of insulation and their uses, including training and education in the areas of asbestos and asbestos-containing insulation. Mr. Krueger eventually went to work for Flexitallic Gasket Company as a marketing director, mostly working out in the field visiting customers. Flexitallic Gasket Company made asbestos gaskets, and was the top supplier in the world of asbestos gaskets. A company called Turner and Newell, which owned 75 percent of the world's asbestos mines, owned Flexitallic Gasket Company. Mr. Krueger worked at Flexitallic Gasket Company from 1975 through 1983, and then Mr. Krueger went to work for Nicholson Steam Trap Company from 1983 through 1993. Throughout Mr. Krueger's work as a chemical engineer, he visited over 600 plants in order to evaluate steam systems.
11. Mr. Krueger visited the chemical plant at which Plaintiff's Decedent worked two (2) times while employed by Flexitallic Gasket Company, and three (3) or four (4) additional times while employed with other companies. Mr. Krueger initially visited the chemical plant at which Plaintiff's Decedent worked in 1977 or 1978, and last visited the chemical plant in 1996. During Mr. Krueger's *Page 9 
last visit at the chemical plant at which Plaintiff's Decedent worked in 1996, Mr. Krueger was at the facility for approximately two (2) weeks doing a complete survey of the chemical plant's steam traps.
12. During Mr. Krueger's visits to the chemical plant at which Plaintiff's Decedent worked, Mr. Krueger observed asbestos-containing insulation throughout the chemical plant to be damaged and not in good condition. In many circumstances, the asbestos-containing insulation that Mr. Krueger observed at the chemical plant at which Plaintiff's Decedent worked was significantly deteriorated, to the point that particles were flaking off of the asbestos-containing insulation. By 1996, Mr. Krueger found the chemical plant at which Plaintiff's Decedent worked to be among the worst plants for asbestos-containing insulation damage that he ever saw. Mr. Krueger observed that the chemical plant at which Plaintiff's Decedent worked was very dusty, and that wherever he was in the chemical plant, he became exposed to hazardous conditions. It is Mr. Krueger's opinion that an employee at the chemical plant at which Plaintiff's Decedent worked would have been exposed to airborne asbestos wherever he or she was in the chemical plant. Finally, Mr. Krueger testified that the chemical plant at which Plaintiff's Decedent worked was dirty the first time that he ever went there, but that the conditions at the chemical plant deteriorated over time, and that the last time he was at the chemical plant, the conditions were worse than before, due to neglect.
13. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's Decedent's exposure to asbestos at Defendant-Employer was continuous throughout his employment at the chemical plant.
14. Plaintiff's Decedent had a previous medical history significant for diabetes, for coronary artery disease, and for degenerative disc disease, requiring multiple back surgeries. Plaintiff's Decedent stopped working altogether on December 3, 1997 due to his coronary artery disease. Thereafter, *Page 10 
Plaintiff's Decedent received short-term disability benefits for a period of six (6) months, and then Plaintiff's Decedent received long-term disability benefits until his death. On March 12, 1998, Plaintiff's Decedent signed a long-term disability claim form in which Plaintiff's Decedent indicated that his claimed disability was due to his coronary artery disease, as well as due to his on-going back condition.
15. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's Decedent's coronary artery disease, as well as his on-going back condition, caused his permanent and total disability, and that Plaintiff's Decedent became permanently and totally disabled from any type of employment prior to his diagnosis of either colon cancer or of asbestosis.
16. On July 30, 2001, a colonoscopy revealed that Plaintiff's Decedent had colon cancer. Plaintiff's Decedent underwent multiple surgeries in an attempt to resect the colon cancer. These surgeries revealed that the colon cancer metastasized to several sites, including to Plaintiff's Decedent's surrounding lymph nodes and to Plaintiff's Decedent's omentum. Although it is certain that the colon cancer metastasized to Plaintiff's Decedent's surrounding lymph nodes and to Plaintiff's Decedent's omentum, there was no medical evidence concerning whether or to what extent these surrounding lymph nodes and omentum either became permanently injured or further disabled Plaintiff's Decedent. Thus, the Full Commission finds, based upon the greater weight of the evidence, that there is insufficient evidence in the record to establish whether or to what extent Plaintiff's Decedent's surrounding lymph nodes and Plaintiff's Decedent's omentum either became permanently injured or further disabled Plaintiff's Decedent.
17. On November 16, 2002, at the age of 58, Plaintiff's Decedent died. Plaintiff's Decedent's death certificate listed widely metastatic colon cancer as the cause of death. Plaintiff qualified as the executrix of the estate of Plaintiff's Decedent on May 7, 2003. *Page 11 
18. From the time Plaintiff's Decedent learned that he had colon cancer until his death, Plaintiff provided care to him, including assisting him with his basic activities of daily living, such as bathing, feeding, grooming, and the like. However, the Full Commission finds, based upon the greater weight of the evidence, that the care provided by Plaintiff to Plaintiff's Decedent was not attendant care for which compensation would be due under the North Carolina Workers' Compensation Act, as no physician ever prescribed attendant care to Plaintiff's Decedent.
19. No physician ever diagnosed Plaintiff's Decedent with asbestosis during the course of his lifetime.
20. Subsequent to Plaintiff's Decedent's death, Plaintiff retained the services of medical and other personnel in order to conduct various tests and procedures, including, but not limited to, an autopsy, complete with histo-pathological examination and analysis of lung and other tissue extracted from the autopsy, review of radiological studies taken of Plaintiff's Decedent, including a "B-reading" of chest films, and an asbestos fiber-burden analysis of Plaintiff's Decedent's lung tissue. Plaintiff requested that this testing be done in order to confirm Plaintiff's Decedent died from colon cancer, in order to determine whether Plaintiff's Decedent suffered from asbestosis, and in order to determine whether asbestos exposure caused Plaintiff's Decedent's colon cancer.
21. Plaintiff retained the services of Dr. Mark Wilson Rigler, in order to perform an asbestos fiber-burden analysis upon Plaintiff's Decedent's lung tissue. Dr. Rigler, who has a doctoral degree in microbiology and a Bachelor of Science degree in biology, has been performing such analyses since 1990. Dr. Rigler is employed by Materials Analytical Services, Inc., a company which tests all types of material samples, as well as all types of environmental samples. Dr. Rigler is a senior consultant *Page 12 
and a project leader for materials and environmental samples analysis with Materials Analytical Services, Inc.
22. Dr. Rigler examined samples of Plaintiff's Decedent's lung tissue in order to determine the presence of asbestos with the use of an electron microscope. Dr. Rigler found 100,608 structures of asbestos per gram of Plaintiff's Decedent's dry lung tissue, as well as amosite asbestos and tremolite asbestos in Plaintiff's Decedent's lung tissue. Although there are many types of asbestos fibers, according to Dr. Rigler, finding amosite asbestos and tremolite asbestos in lung tissue is unusual, since these types of asbestos are very large structures which are not the types of asbestos found in the general population, but rather, are found more commonly in occupational/industrial settings. Dr. Rigler found the asbestos fiber-burden in Plaintiff's Decedent's lungs to be double the amount expected for a person in the general population not exposed to asbestos in an occupational/industrial situation.
23. Dr. Rigler indicated that there are many studies linking colon cancer to asbestos exposure. Research conducted by the Environmental Protection Agency (EPA), by the National Institute for Occupational Safety and Health (NIOSH), and by the Occupational Safety and Health Administration (OSHA) indicates that asbestos can cause colon cancer. Ultimately, Dr. Rigler opined, based upon the fiber-burden found in Plaintiff's Decedent's lungs, including the size of the asbestos structures, as well as the type of the asbestos fibers, that Plaintiff's Decedent's job with Defendant-Employer placed him at an increased risk for developing colon cancer, as a result of the asbestos exposure in his employment, as compared to members of the general public not exposed to asbestos in an occupational/industrial setting.
24. Plaintiff retained the services of Dr. Arthur Leonard Frank, in order to render certain opinions based upon Dr. Frank's evaluation of the medical and of the other records concerning *Page 13 
Plaintiff's Decedent's exposure to asbestos. Dr. Frank is a professor of public health at the Drexel University School of Public Health, as well as a board-certified internal medicine physician and a board-certified occupational medicine physician. Dr. Frank spent two (2) years as a commissioned officer on active duty in the United States Public Health Service, working at the lung cancer branch of the National Cancer Institute studying the effects of asbestos on respiratory tissue.
25. Dr. Frank opined that Plaintiff's Decedent had asbestosis and adenocarcinoma of the colon, and that Plaintiff's Decedent died as a result of the colon cancer. Dr. Frank further opined that Plaintiff's Decedent's asbestos exposure at his job with Defendant-Employer caused both his asbestosis and his colon cancer. Moreover, Dr. Frank opined that Plaintiff's Decedent's job with Defendant-Employer placed him at a greater risk for the development of both asbestosis and of colon cancer, as a result of the asbestos exposure in his employment, as compared to members of the general public not exposed to asbestos in an occupational/industrial setting. In particular, Dr. Frank explained that the minimum latency period between asbestos exposure and the development of colon cancer is generally 10 years; however, once colon cancer develops, any on-going exposure to asbestos at all, even as little as a single fiber, may augment or may promote the further development of colon cancer.
26. Dr. Frank based his causation opinions upon his review of the work history and of the medical records of Plaintiff's Decedent, including the finding on an October 30, 2002 chest film of bi-basilar densities in Plaintiff's Decedent's lungs, and a August 14, 2004 "B-reading" of Plaintiff's Decedent's chest film, with a score of one (1) / zero (0). Additionally, Dr. Frank believed that Dr. Rigler's finding of asbestos fibers in Plaintiff's Decedent's lung tissue at twice the background level to be a significant causative factor. *Page 14 
27. Dr. Frank indicated that there are many studies regarding the relationship between colon cancer and asbestos exposure, that he is of the opinion that there is, in fact, a causal relationship between colon cancer and asbestos exposure, and that EPA, NIOSH, OSHA, and the American Cancer Society all have research linking colon cancer to asbestos exposure.
28. All of the named defendants retained the services of Dr. Victor Louis Roggli, in order to examine Plaintiff's Decedent's lung tissue. Dr. Roggli is board-certified in anatomical pathology and in clinical pathology, and is employed by the Department of Pathology at Duke University Medical Center. Dr. Roggli specializes in pulmonary diseases, with a sub-specialty in asbestos-related diseases, and has been working in the field of pathology related to pulmonary diseases since 1976. Previously, Dr. Roggli worked at the Veteran's Administration in order to study asbestos fibers in the lungs of small rodents and in the lungs of other laboratory animals. In addition, Dr. Roggli worked at the National Institute of Environment Health Sciences performing pulmonary pathology research, and published two (2) books about asbestos-related diseases.
29. Dr. Roggli opined that Plaintiff's Decedent did not have pulmonary interstitial fibrosis related to asbestos exposure, that Plaintiff's Decedent did not have asbestosis, and that Plaintiff's Decedent's job with Defendant-Employer did not place him at an increased risk of exposure to asbestos. Although Dr. Roggli opined that Plaintiff's Decedent did have colon cancer, Dr. Roggli believed Plaintiff's Decedent's colon cancer to be unrelated to asbestos exposure.
30. Dr. Roggli based his causation opinions upon a review of tissue samples from Plaintiff's Decedent under a different, though valid, microscopic technique that is not as high of a magnification as that used by Dr. Rigler. Dr. Roggli could only see asbestos bodies; however, Dr. Rigler could view *Page 15 
asbestos fibers and asbestos structures. Dr. Roggli found no asbestos bodies in Plaintiff's Decedent's lung tissue samples.
31. In Dr. Roggli's opinion, even assuming hypothetically that Plaintiff's Decedent had asbestosis, there would be insufficient evidence to relate colon cancer to asbestos exposure. According to Dr. Roggli, although there is some epidemiological research suggesting an association between colon cancer and asbestos exposure, it is Dr. Roggli's opinion that this research does not establish a causal relationship to a reasonable degree of medical probability.
32. Both Dr. Frank and Dr. Roggli are each very qualified physicians in their respective fields of expertise, and each of these physicians strongly disagrees with the other's opinions concerning the circumstances and the factors leading up to and causing Plaintiff's Decedent's death. Both Dr. Frank and Dr. Roggli cite research by well-respected organizations which would tend to support their opinions. However, based upon the greater weight of the evidence, the Full Commission gives greater weight to the opinions of Dr. Rigler and the opinions of Dr. Frank than to the opinions of Dr. Roggli.
33. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's Decedent contracted the occupational disease of asbestosis, as well as the occupational disease of colon cancer, despite the fact Plaintiff's Decedent's diagnosis of asbestosis could not be made until after his death. The Full Commission further finds, based upon the greater weight of the evidence, that Plaintiff's Decedent's colon cancer caused his death, that Plaintiff's Decedent did not suffer from any noticeable impairment from his asbestosis during his lifetime, and that prior to Plaintiff's Decedent's diagnosis of colon cancer, he became disabled from his employment with Defendant-Employer due to his coronary artery disease and due to his on-going back condition. *Page 16 
34. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's Decedent's asbestos exposure at his job with Defendant-Employer caused both his asbestosis and his colon cancer, and that Plaintiff's Decedent's job with Defendant-Employer placed him at an increased risk for contracting both asbestosis and colon cancer, as a result of the asbestos exposure in his employment, as compared to members of the general public not exposed to asbestos in an occupational/industrial setting.
35. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's Decedent became injuriously exposed to asbestos during the course and the scope of his employment at the chemical plant owned and run by Defendant-Employer. The Full Commission further finds, based upon the greater weight of the evidence, that Plaintiff's Decedent sustained his last injurious exposure to asbestos during his employment at the chemical plant with Defendant-Employer in the 1990's, through the last day of his employment with Defendant-Employer on December 3, 1997, while Defendant-Carrier Crawford-Pennsylvania provided workers' compensation insurance coverage to Defendant-Employer, from October 1, 1992 through December 3, 1997.
36. The Full Commission finds, based upon the greater weight of the evidence, that there is insufficient evidence in the record to establish that Defendant-Employer either caused the injury or the death of Plaintiff's Decedent through any willful failure to comply with any statutory requirement, or through any willful failure to comply with any Order of the North Carolina Industrial Commission, pursuant to § 97-12
of the North Carolina General Statutes.
37. Plaintiff's Decedent's compensation for the last full year of his employment with Defendant-Employer was $34,959.96, yielding a compensation rate of $448.43 per week. *Page 17 
38. Plaintiff is the surviving spouse of Plaintiff's Decedent, and Plaintiff was the sole dependent of Plaintiff's Decedent at the time of his death. The Full Commission finds, based upon the greater weight of the evidence, that there is insufficient evidence in the record to establish Plaintiff's inability to support herself due to physical and/or mental disability, pursuant to § 97-38 of the North Carolina General Statutes.
39. None of the named defendants defended this claim without reasonable grounds, and as such, the assessment of attorney's fees under § 97-88.1 of the North Carolina General Statutes is neither proper nor justified.
40. The Full Commission finds, based upon the greater weight of the evidence, that there is insufficient evidence in the record to establish that any of the named defendants are entitled to receive any type of credit as a result of any recovery Plaintiff may have made from any third-party tort-feasors.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's Decedent contracted colon cancer, which metastasized to his surrounding lymph nodes and to his omentum, and Plaintiff's Decedent contracted asbestosis. Plaintiff's Decedent died as a result of the colon cancer. Plaintiff's Decedent did not suffer from any noticeable impairment from his asbestosis during the course of his lifetime. There is insufficient evidence in the record to establish whether or to what extent Plaintiff's Decedent's surrounding lymph nodes and Plaintiff's Decedent's omentum either became permanently injured or further disabled Plaintiff's Decedent. *Page 18 
2. Plaintiff's Decedent's coronary artery disease, as well as his on-going back condition, caused his permanent and total disability, and Plaintiff's Decedent became permanently and totally disabled prior to his diagnosis of either colon cancer or of asbestosis.
3. Plaintiff's Decedent's asbestos exposure at his job with Defendant-Employer caused both his asbestosis and his colon cancer, and Plaintiff's Decedent's job with Defendant-Employer placed him at an increased risk for contracting both asbestosis and colon cancer, as a result of the asbestos exposure in his employment, as compared to members of the general public not exposed to asbestos in an occupational/industrial setting. N.C. Gen. Stat. § 97-53 (2007);Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
4. Plaintiff's Decedent became injuriously exposed to asbestos during the course and the scope of his employment at the chemical plant owned and run by Defendant-Employer. Plaintiff's Decedent sustained his last injurious exposure to asbestos during his employment at the chemical plant with Defendant-Employer in the 1990's, through the last day of his employment with Defendant-Employer on December 3, 1997, while Defendant-Carrier Crawford-Pennsylvania provided workers' compensation insurance coverage to Defendant-Employer, from October 1, 1992 through December 3, 1997. N.C. Gen. Stat. § 97-57 (2007). Defendant-Carrier Crawford-Pennsylvania was the last workers' compensation insurance carrier providing insurance coverage to Defendant-Employer during Plaintiff's Decedent's employment with Defendant-Employer, and Defendant-Carrier Crawford-Pennsylvania is the sole insurance carrier that is liable to Plaintiff for workers' compensation benefits.
5. There is insufficient evidence in the record to establish that Defendant-Employer either caused the injury or the death of Plaintiff's Decedent through any willful failure to comply with any statutory requirement, or through any willful failure to comply with any Order of the North Carolina *Page 19 
Industrial Commission, pursuant to § 97-12 of the North Carolina General Statutes. N.C. Gen. Stat. § 97-12 (2007).
6. Plaintiff is the surviving spouse of Plaintiff's Decedent, and Plaintiff was the sole dependent of Plaintiff's Decedent at the time of his death. There is insufficient evidence in the record to establish Plaintiff's inability to support herself due to physical and/or mental disability, pursuant to § 97-38 of the North Carolina General Statutes. N.C. Gen. Stat. § 97-38 (2007).
7. Plaintiff's Decedent's estate is entitled to an equitable award for permanent injury to both of Plaintiff's Decedent's lungs, which are important internal organs. N.C. Gen. Stat. § 97-31(24) (2007).
8. Plaintiff's Decedent's estate is entitled to an equitable award for permanent injury to Plaintiff's Decedent's colon, which is an important internal organ. N.C. Gen. Stat. § 97-31(24) (2007).
9. Since Plaintiff's Decedent's asbestos exposure at his job with Defendant-Employer caused his colon cancer, which in turn, caused his death, Plaintiff is entitled to 400 weeks of compensation at the rate of $448.43 per week beginning November 16, 2002, pursuant to § 97-38 of the North Carolina General Statutes. N.C. Gen. Stat. § 97-38 (2007).
10. The medical treatment, testing, and evaluation which Plaintiff's Decedent received as a result of his colon cancer and of his asbestosis was reasonably required to diagnose his conditions, to effect a cure for his conditions, to provide relief from his conditions, and/or to lessen his disability. Plaintiff is entitled to compensation for all medical treatment resulting from Plaintiff's Decedent's compensable diseases of colon cancer and of asbestosis, and for all medical treatment, which gave relief to Plaintiff's Decedent during the time in which he suffered from the compensable disease of colon cancer. *Page 20 
11. Plaintiff is entitled to a burial expense of $3,500.00 for the burial of Plaintiff's Decedent.
12. The care provided by Plaintiff to Plaintiff's Decedent was not attendant care for which compensation would be due under the North Carolina Workers' Compensation Act, as no physician ever prescribed attendant care to Plaintiff's Decedent. Therefore, Plaintiff is not entitled to any attendant care expenses.
13. None of the named defendants defended this claim without reasonable grounds, and as such, the assessment of attorney's fees under § 97-88.1 of the North Carolina General Statutes is neither proper nor justified. N.C. Gen. Stat. § 97-88.1 (2007).
14. There is insufficient evidence in the record to establish that any of the named defendants are entitled to receive any type of credit as a result of any recovery Plaintiff may have made from any third-party tort-feasors.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. FMC Corp. f/k/a Lithium Corp. of America, and Crawford Co. (National Union Fire Insurance/Insurance Company-State of Pennsylvania/AIG), (hereinafter referred to as "Appealing Defendants") shall pay $5,000.00 for permanent injury to each of Plaintiff's Decedent's lungs, for a total of $10,000.00, to Plaintiff's Decedent's estate.
2. Appealing Defendants shall pay $20,000.00 for permanent injury to Plaintiff's Decedent's colon to Plaintiff's Decedent's estate. *Page 21 
3. Appealing Defendants, shall pay 400 weeks of compensation at the rate of $448.43 per week, beginning November 16, 2002, to Plaintiff. The accrued compensation shall be paid in a lump sum to Plaintiff.
4. Appealing Defendants shall pay for all reasonably required medical evaluations, testing and treatment resulting from Plaintiff's Decedent's compensable disease of colon cancer, according to procedures approved by the Industrial Commission.
5. Appealing Defendants shall pay a burial expense of $3,500.00 to Plaintiff for the burial of Plaintiff's Decedent.
6. A reasonable attorney's fee of 25 percent of the compensation awarded to Plaintiff's Decedent's estate in paragraph one (1) and paragraph two (2), and to Plaintiff in paragraph three (3), above, is hereby approved to be deducted from the lump sums accrued and thereafter, every fourth (4th) payment due Plaintiff shall be paid directly to Plaintiff's counsel. *Page 22 
7. Appealing Defendants shall pay the costs of these proceedings, which includes a deposition expert witness fee of $475.00 to Dr. Mark Wilson Rigler, a deposition expert witness fee of $875.00 to Dr. Victor Louis Roggli, a deposition expert witness fee of $875.00 to Dr. Arthur Leonard Frank, and a deposition expert witness fee of $504.00 to Dr. Douglas Bryan Young, if not already paid.
This the ___ day of September 2008.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
S/___________________ DANNY LEE McDONALD COMMISSIONER
S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1